IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| Western World Insurance Company, | ) | C.A. No.: 7:06-217-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | **O R D E R** |
| vs. | ) | |
| | ) | |
| Empire Fire and Marine Insurance | ) | |
| Company and American Trans Med, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This action is an insurance coverage dispute between the business automobile insurer, Empire Fire and Marine Insurance Company (hereinafter "Empire") and the general liability insurer, Western World Insurance Company (hereinafter "Western World"), for the same insured, American Trans Med, Inc. (hereinafter "Trans Med"). The parties advised the Court that the claims against and by Trans Med have been resolved by agreement of the parties and are no longer at issue in this matter and that Trans Med has agreed to dismiss its counterclaim and crossclaim. Trans Med did not appear at the hearing, and according to counsel for Western World, Trans Med was being dismissed from the action. Additionally, Western World advised the Court that it was withdrawing its demand for contribution/indemnification in this action as being premature. The parties have advised the Court that the only issue before the Court is a declaratory judgment as to the duty to defend by each insurance company.

Before the Court are cross-motions for summary judgment filed by both Empire and Western World. A hearing was held on the matter on November 7, 2006. Although notified of the hearing, counsel for Trans Med did not appear at the hearing for the reasons stated above.

1

For the reasons stated below, this Court grants Empire's motion for summary judgment and finds that Empire did not have a duty to defend, and, therefore, its policy did not provide coverage for the insured, Trans Med. The Court denies the motion for summary judgment by Western World and finds that, under its insurance policy, Western World had a duty to defend Trans Med as to the underlying lawsuit. The parties have indicated to the Court that these are the only issues as to which a ruling is needed. If any further Orders are needed to end the case, counsel shall contact this Court immediately. Otherwise, the Court may instruct the Clerk that the case will be terminated within three business days after entry of this Order.

## FINDINGS OF FACT

The following matters are undisputed:

**1.    The Policies of Insurance**

*The "Western World" Policy*

Western World issued a policy of general liability insurance to Trans Med, an ambulance service, bearing policy number NPP0774319, with effective dates of May 1, 2002 to May 1, 2003. Western World's Commercial Liability Policy provides coverage for Transmed's "ambulance services, for-profit-including products and/or completed operations." The policy contains a Professional Liability attachment for "ambulance services, for-profit" and provides, "this form modifies the insurance provided under the Commercial General Liability Policy." The Insuring Agreement of the Professional Liability form states: "a. We will pay those sums the insured becomes legally obligated to pay as damages because of any 'bodily injury', 'property damage', or 'personal injury' to which this coverage part applies caused by a 'professional incident'." Subsection b provides: "This insurance applies to 'bodily injury', 'property damage' and 'personal

injury' only if: (1) The 'bodily injury', 'property damage', or 'personal injury' is caused by a 'professional incident' that takes place in the 'coverage territory'."

"**Professional incident**" is defined in Section F of the professional liability endorsement as "any negligent act or omission: a. In the furnishing of healthcare services including the furnishing of food, beverages, medications or appliances in connection with such services and the post-mortem handling of human bodies; b. In the rendering of any other professional services but only of the type described in the 'Schedule' of this coverage part." The Schedule describes the covered professional services as "ambulance services, for-profit". The policy also contains an endorsement that modifies Section II, "Who is an Insured", to include "all emergency care personnel, volunteer or employed by the named insured, provided that no act shall be deemed to be a professional service unless committed in the **regular course of duty** for the named insured." (Emphasis added)

Western World's policy contains Exclusion "g", which excludes coverage for "bodily injury . . . arising out of the **ownership, maintenance, use** or entrustment to others **of any . . . auto. . . owned or operated by . . . any insured**. **Use includes loading or unloading.**" (Emphasis added) The term "loading and unloading" is defined in the policy as the "handling of property."

*The "Empire" Policy*

Empire issued a policy of business automobile insurance to Trans Med bearing policy number CL0421138 with effective dates of May 1, 2002 to May 1, 2003. The business auto policy issued by Empire to Trans Med contains the following relevant provisions:

**Section II – Liability Coverage**

A. **Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered

3

> "auto." … However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or property damage" … to which this insurance does not apply.
>
> \*\*\*
>
> PROFESSIONAL SERVICES NOT COVERED
>
> \*\*\*
>
> LIABILITY COVERAGE is changed by adding the following exclusions:
>
> This insurance does not apply to:
>
> 1.  "Bodily injury" resulting from the providing or the failure to provide any medical or other professional services.
>
> 2.  "Bodily injury" resulting from food or drink furnished with these services.
>
> 3.  "Bodily injury" or "property damage" resulting from the handling of corpses.

**2.     The Underlying Complaints**

Survival and wrongful death lawsuits styled <u>Jimmy L. Whelchel as Personal Representative of the Estate of Harry N. Whelchel versus Spartanburg Regional Healthcare System and American Transmed, Inc</u>, civil action numbers 4-CP-42-3040 and 4-CP-42-3041, were filed in the Spartanburg County Court of Common Pleas arising out of an incident which occurred on September 11, 2002. As part of the allegations entitled "Background," the complaint alleges in relevant part as follows:

> 9.  Defendant American Transmed was called to transport Mr. Whelchel from Spartanburg Regional to home. Mr. Whelchel was placed on the stretcher and quickly wheeled to the Transmed vehicle. The employee of Transmed let go of the stretcher to open the Transmed vehicle door and while attempting to turn the stretcher, hit a pot hole in the pavement of Defendant Spartanburg Regional Healthcare System. Mr. Whelchel spilled onto the pavement sustaining several injuries.

As against Trans Med, the complaints, which are identical in their allegations of negligence, alleged as follows:

16. Plaintiff is informed and believes that Defendant Transmed was negligent, willful, wanton, reckless and grossly negligent in one or more of the following ways:

    a. In not strapping Mr. Whelchel onto the stretcher;

    b. In failing to observe any obstacles or pot holes in the pavement which may cause the stretcher to become unsteady;

    c. In failing to properly train employees in proper procedures of placing patients onto [sic] stretcher and transporting them to the Transmed vehicles;

    d. In letting go of the stretcher while being moved thereby failing to provide stability to the stretcher;

    e. In engaging in horseplay during the transport of an elderly patient on a stretcher;

    f. And in other particulars which shall be evident through discovery.

Additionally, in the negligence cause of action against Trans Med, the following allegations are relevant:

13. Defendant American Transmed . . . provided services of transportation to patients . . . [and that] the particular employees transporting Plaintiff's decedent on this date failed to properly secure Plaintiff's decedent on the stretcher and were engaged in horseplay at the time Plaintiff's decedent was thrown from the stretcher… Further, American Transmed held itself out to the general public as employing competent staff and by using good procedures for loading patients onto stretchers, taking the proper amount of time to safety [sic] transport them to the Transmed vehicles and being cautious of the surroundings in doing so.

## CONCLUSIONS OF LAW

**Summary Judgment Standard**

Rule 56(c), Fed.R.Civ.P. provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(e).

1.  **Empire's Business Auto Policy is not triggered by the allegations of the underlying actions and, therefore, provides no duty to defend or coverage to Trans Med.**

"An insurer's duty to defend is separate and distinct from its obligation to pay a judgment rendered against an insured. However, these duties are interrelated. If the facts alleged in a complaint against an insured fail to bring a claim within policy coverage, an insurer has no duty to defend. Accordingly, the allegations of the complaint determine the insurer's duty to defend." *South Carolina Medical Malpractice Liab. Ins. J.U.A. v. Ferry*, 291 S.C. 460, 354 S.E.2d 378, 380 (1987) (internal citations omitted). This Court is limited to examining the allegations of the complaint and the provisions of the policy at issue to determine the duty to defend. *B.L.G. Enterprises, Inc. v. First Financial Ins. Co.*, 334 S.C. 529, 514 S.E.2d 327, 330 (1999). "If the facts alleged in the complaint raise a reasonable possibility that the insured may be held liable for some act or omission covered by the policy, then the insurer must defend. If no such possibility is raised, no duty of defense is owed." *Liberty Life Ins. Co. v. Commercial Union Ins. Co.*, 857 F.2d 945, 949 (4th Cir. 1988). "Hence, whether a duty to defend exists is determined by comparing the allegations of the complaint to the terms of the policy." *Id*. "Moreover, an insurer has no duty to defend an insured where the damage was caused by a reason unambiguously excluded under the policy." *Federated Mut. Ins. Co. v. Piedmont Petroleum Corp.*, 314 S.C. 393, 444 S.E. 2d 532, 533 (Ct. App. 1994).

Under the terms of the Empire policy, the insuring agreement provides that Empire agrees to "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" Therefore, the duty to defend and the existence of coverage depend upon whether the injuries to Mr. Whelchel resulted from the "ownership, maintenance, or use" of the covered vehicle.

Under South Carolina law, no automobile insurance policy may be issued unless it contains a provision insuring against loss resulting from the liability provided by law arising out of the "ownership, maintenance, or use of the motor vehicle." S.C. Code Ann. § 38-77-140 (2004). South Carolina courts have developed a three-part test to determine whether conduct constitutes "ownership, maintenance, or use" of an insured automobile: (1) there must be a causal connection between the vehicle and the injury; (2) no independent act breaks the causal link; and (3) the vehicle is being used for transportation at the time of the injury. *See State Farm Fire & Casualty Co. v. Aytes*, 332 S.C. 30, 503 S.E.2d 744 (1998); *Doe v. South Carolina State Budget and Control Board*, 337 S.C. 294, 523 S.E.2d 457 (1999); *Travelers Indemnity Co. v. Auto World of Orangeburg, Inc.*, 334 S.C. 137, 511 S.E.2d 692 (Ct. App. 1999).

The South Carolina courts have described "causal relationship," as used in the first element of the test, stating that "[t]he causal connection is established where it can be shown the vehicle was an 'active accessory' to the assault. The causation required is something less than proximate cause and something more than the vehicle being the mere site of the injury. The injury must be foreseeably identifiable with the normal use of the vehicle." *Auto World*, 511 S.E.2d at 698 (internal citations omitted) (citing *Aytes*, 503 S.E.2d 744 (1998)). *See also Doe*, 523 S.E.2d at 458.

7

As to the second element of the three-part test, whether there is any independent act that breaks the causal link, the South Carolina courts have generally found this causal connection lacking in cases in which the party causing the injury had left the vehicle for some time prior to causing the injury or in which the vehicle was stationary and in no way used as a vehicle during the incident. The causal link will be deemed broken, meaning that the motorist will not be able to recover under his automobile policy, if the vehicle is merely the site of the injury.[1]

Finally, the third element of the test requires that the vehicle be used for transportation at the time of the accident for the injuries to be considered within the "ownership, maintenance, or use" of the vehicle. If a vehicle is not being used for transportation at the time of the injury, there is no duty to defend. *See Auto World* and *Doe*.

A recently decided case, *Peagler v. USAA Insurance Co.*, 368 S.C. 153, 628 S.E.2d 475 (2006), is helpful in examining the issues raised in the present case. In *Peagler*, a wife decided to take her sons to school in her husband's pickup truck which he occasionally used for hunting. She entered the vehicle, started the engine, fastened her seatbelt and closed the door. Her husband came to the truck to remove the shotguns he had in a rack in the truck from the vehicle and, in the process of doing so, accidentally shot and killed his wife. The South Carolina Supreme Court applied the three-factor *Aytes* test and held that the first factor – causal connection – was not satisfied. It distinguished cases in which coverage existed because the vehicle was used to perpetrate an assault

---

[1] *See Wright v. North Area Taxi, Inc.*, 337 S.C. 419, 523 S.E.2d 472 (Ct. App. 1999) (gunshot injury to taxicab driver caused by passenger not covered under automobile policy because taxicab was merely the site of the injury). *See also Plaxco v. United States Fidelity & Guaranty Co.*, 252 S.C. 437, 166 S.E.2d 799 (1969) (car used to jump-start plane; after some of the jumper cables were disconnected, plane ran into another plane; court held damage not covered under automobile policy because there was no causal connection between the use of the car as a power source and the subsequent forward movement of the plane).

8

or injury on another person. *Id*. 628 S.E.2d at 480. It also declined to follow precedent from other jurisdictions finding coverage for accidental injuries or deaths occurring from the loading or unloading of a firearm from a vehicle. *Id*. Finally, it reiterated the *Aytes* test and held that the vehicle must be an "active accessory" to the injury, not merely the site of it.

Turning to the present matter, an analysis of the facts as pled in the underlying actions clearly leads to the conclusion that none of the three prongs of the "ownership, maintenance, or use" test are met. First, the causal connection does not exist. For there to be a causal link under South Carolina law, the injuries sustained must be "foreseeably identifiable with the normal use of an automobile." *State Farm Mut. Automobile Ins. Co. v. Bookert*, 337 S.C. 291, 523 S.E.2d 181 (S.C. 1999). In other words, the vehicle must be an active accessory in causing the injury. In the case at hand, the vehicle was not an active accessory in causing Mr. Whelchel's injuries. The underlying allegations do not support an inference that Mr. Whelchel was either in the ambulance, or that the stretcher on which Mr. Whelchel was lying was even touching the ambulance at the time he sustained his injuries.

Second, even assuming the first element was met, such that the ambulance was an active accessory, South Carolina law requires that nothing break the causal link between a vehicle and injuries sustained. The underlying complaints contain allegations of conduct that break any possible causal connection. For example, there is the potential intervening negligence of the American Transmed employee. The complaint alleges that the employees failed to properly secure Mr. Whelchel to the gurney, were engaged in horseplay, failed to use care in the operation of the gurney and negligently let go of the stretcher, all causing Mr. Whelchel's injuries.

Finally, even assuming the first and second elements of the *Aytes* test were met, the third element of the test requires that the vehicle be used for transportation at the time of the accident for

the injuries to constitute "ownership, maintenance, or use" of the vehicle. If a vehicle is not being used for transportation at the time of the injury but is instead the mere site of the injury, there is no duty to defend. There are no allegations in the underlying complaints that the ambulance covered by the Empire policy was being used for transportation at the time of the accident.  The case at hand is similar to *Peagler, Auto World* and *Doe* in that in all of those cases, the automobile liability policy was held not to apply because the vehicle at issue was not being used for transportation at the time of the injury. However, the present case goes one step further. In *Peagler, Auto World* and *Doe*, the vehicle at issue was the site of the injury claimed. In the case at hand, however, there is no allegation that Mr. Whelchel was in or even touching the ambulance at the time his injuries were sustained.

Western World argues that because the underlying complaints allege in the "Background" section that the ambulance attendant let go of the stretcher to open the ambulance door, Mr. Whelchel was in the process of being "loaded" into the ambulance at the time of his injury thus triggering Empire's duty to defend.  Western World argues that opening an ambulance door is necessary to the "use" of a motor vehicle.  This Court cannot agree with this interpretation of the complaints.  Even if the process of transporting Mr. Whelchel to the vicinity of the ambulance could be considered "loading," there is still no evidence establishing the *Aytes* factors – there is no allegation or evidence that the **ambulance** in any way caused Mr. Whelchel's injuries and there is no allegation or evidence that the ambulance was being used for **transportation** at the time of the injury.  Fairly read, the complaints allege improper procedures used by the ambulance attendants in securing Mr. Whelchel to the stretcher and in transporting him to the ambulance on the stretcher. There are no allegations which implicate the ambulance itself.

Looking to the three-part test created by the South Carolina courts for determining whether or not an injury results from the "ownership, maintenance, or use" of a vehicle, in the case at hand, the injuries allegedly sustained by Mr. Whelchel were not the result of the "ownership, maintenance, or use" of the Trans Med ambulance. Therefore, Empire's duty to defend is not triggered by the allegations of the underlying complaints and, accordingly, there is no coverage under the Empire policy for the injuries sustained by Mr. Whelchel.

**2.     Additionally, Empire's Professional Service Exclusion Applies.**

Empire's policy contains an exclusion for "professional services." The South Carolina Supreme Court has defined a professional act or service as

> one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. . . . In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself.

*Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 319 S.C. 12, 459 S.E.2d 318, 321 (Ct. App. 1994) *(citing South Carolina Medical Malpractice Liab. Ins. Joint Underwriting Ass'n*, 354 S.E.2d at 380).[2] Other courts have held that ambulance services are to be considered professional services. *See Curtis Ambulance of Florida, Inc. v. Bd. Of County Comm'rs*, 811 F.2d 1371 (10th Cir. 1987) (ambulance services qualify as professional services); *In the Matter of Amherst Columbia Ambulance Service, Ltd. v. Gross*, 80 A.D.2d 719, 437 N.Y.S.2d 137 (N.Y. App. Div. 1981) ("the furnishing of ambulance services is one requiring special skill or training…").

---

[2] In *Isle of Palms*, the court found that extermination was a professional service under a policy exclusion but held that a duty to defend existed under the liability insurance policy, since "to give effect to the professional liability exclusion would render the policy virtually meaningless." 459 S.E.2d at 321.

11

Many courts that have addressed similar issues have looked to the nature of the services provided when attempting to determine whether the services in question are to be considered professional services. Tasks that are more routine and do not require specialized knowledge are generally held not to be "professional services." However, at least one court has held that a delay in the arrival of an ambulance which exacerbated injuries (and the failure to advise the caller that the ambulance was delayed) is to be considered a professional service. *See Legion Indem. Co. v. CareStat Ambulance, Inc.*, 152 F. Supp. 2d 707 (E.D. Pa. 2001) (dispatching an ambulance in a timely manner and notifying someone that no ambulance was available are "professional services" as described in a "professional services" exclusion).

In the case at hand, securing and transporting an individual on a rolling stretcher requires specialized knowledge and so is part of the "professional services" provided by an ambulance service. According to SC ADC 61-7, § 1000, the minimum crew for a basic life support ambulance is one driver and one EMT. The EMT must be licensed by the South Carolina Department of Health and Environmental Control ("DHEC").[3] Accordingly, by virtue of the fact that the complaint alleges that the Trans Med employees, one of whom had to be a licensed EMT with specialized knowledge and skill, negligently secured Mr. Whelchel to a stretcher and negligently transported him to an ambulance, professional services were offered. Therefore, the duty to defend is not triggered and, thus, there is no coverage for transporting an individual on a rolling stretcher as set forth in the underlying complaint in this case.

### 3. Western World has a duty to defend under its policy.

---

[3] SC ADC 61-7, § 900 et seq..

Western World cites *MGC Management of Charleston, Inc. v. Kinghorn Ins. Agency*, 336 S.C. 542, 520 S.E.2d 820, 823 (Ct. App. 1999), for the proposition that South Carolina courts recognize that an auto exclusion such as the one in the Western policy is unambiguous and enforceable. Western World also cites *Home Indemnity Co v. Harleysville Mutual Ins.*, 252 S.C. 452, 166 S.E.2d 819 (1969) for the proposition that the effect of a loading and unloading provision is to expand the term "use of the vehicle". However, the Court notes that, although the insurance policy in *MGC Management* apparently contained the same or a similar auto exclusion as the Western World policy, the policy in *MGC Management* did not contain a professional liability endorsement. Additionally, the Court finds that the Western World policy defines "loading and unloading" as "the hauling of property". Therefore, the policy language is construed against the insurance company, its drafter, to effectively exclude unloading property and not people.

The Court finds that the rationale of *Isle of Palms* is applicable to the case at bar. That, is, if the auto exclusion in the Western World policy were applied to deny a duty to defend in the case at bar, this would exclude the very risks that American Trans Med was trying to insure. Western World's policy is intended to provide general commercial and professional liability coverage to Trans Med, whose business is providing ambulance service. The professional endorsement of Western World's policy clearly recognizes that intended business. "The internal inconsistency created by an exclusion which purports to bar coverage for claims arising out of the very operation sought to be insured renders the policy ambiguous, and we must resolve that ambiguity in favor of coverage." *Id*. Additionally, the Court notes that the underlying complaints contain allegations which do not pertain to use of a vehicle, such as failing to strap the patient properly onto the stretcher and failing to properly train employees.

Accordingly, this Court construes any ambiguity created by Western World's attempted exclusion of the use of the ambulance against Western World.[4]  The Court finds that, when considering the facts of the underlying complaints, it is clear that Western World has a duty to defend Trans Med in the underlying complaints in this case.

## Conclusion

For the foregoing reasons, it is

ORDERED that Defendant Empire's motion for summary judgment is granted and this Court finds and concludes that Empire has no duty to defend, and therefore no duty to indemnify, Trans Med for the injuries to Mr. Whelchel arising from the incident described in the underlying complaints.

ORDERED that Plaintiff Western World's motion for summary judgment is denied and this Court finds and concludes that Western World has a duty to defend the underlying lawsuits.

ORDERED that counsel advise the Court immediately whether any further proceedings are required in connection with this action, and that this case may be terminated within three business days after the entry of this Order if the Court is not advised that further proceedings are needed.

---

[4] The Court also notes that, "in construing an insurance contract, all of its provisions must be considered together.  Presumably, all portions of a contract must be read as a whole, giving the appropriate weight to all of its provisions." *MGC Management*, *citing Yarborough v. Phoenix Mutual Life Insurance Co*., 266 S.C. 584, 225 S.E.2d 344 (1976).

**AND IT IS SO ORDERED**.

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

November 16, 2006
Florence, South Carolina